IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RICHARD LOPARDO, *et al.*, | ) | CASE NO. 1:02 CV 764 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| FRANK GRUTTADAURIA, et al., | ) | MEMORANDUM OPINION |
| | ) | AND ORDER |
| Defendants. | ) | |

This matter is before the Court on Defendants, Hambrecht & Quist, Inc., and J.P. Morgan Chase & Co.'s (hereinafter collectively referred to as "H&Q") Motion for Summary Judgment. (ECF # 280). Plaintiffs, Richard and Catherine Lopardo, the only Defendants with claims still pending against H&Q, filed a Response in Opposition to the Motion to Dismiss. (ECF #286). The Lopardos filed claims against H&Q generally seeking to hold them vicariously liable for the illegal acts of their employee, Frank Gruttadauria. The Lopardos also directly accuse H&Q of breach of fiduciary duty, negligent misrepresentation, breach of implied contract and bailment, and negligence in the hiring, retention, and supervision of Mr. Gruttadauria. H&Q claims that there is no evidence to support any of the claims made against it, and that Richard and Catherine

Lopardo's claims are barred by the applicable statute of limitations. The Court has thoroughly reviewed the parties' briefs, and the applicable facts and law. For the reasons set forth below, Defendant's Motion for Summary Judgment is hereby GRANTED.

## **Summary Judgment Standard**

Summary judgment is appropriate when the court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The burden of showing the absence of any such "genuine issue" rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citing FED. R. CIV. P. 56(c)). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. The court will view the summary judgment motion in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of their case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322). Accordingly, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be

evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (citing *Anderson*, 477 U.S. at 252). Moreover, if the evidence presented is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citations omitted). In most civil cases involving summary judgment, the court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252. However, if the non-moving party faces a heightened burden of proof, such as clear and convincing evidence, it must show that it can produce evidence which, if believed, will meet the higher standard. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

Once the moving party has satisfied its burden of proof, the burden then shifts to the non-mover. The non-moving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't of Transp.,* 53 F.3d 146, 149 (6th Cir. 1995). FED. R. CIV. P. 56(e) states:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

The Federal Rules identify the penalty for the lack of such a response by the nonmoving party as an automatic grant of summary judgment, where otherwise appropriate. *Id.*

Though parties must produce evidence in support of and in opposition to a motion for summary judgment, not all types of evidence are permissible. The Sixth Circuit has concurred with the Ninth Circuit that "'it is well settled that only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment.'" *Wiley v. United States*, 20 F.3d

222, 225-26 (6th Cir. 1994) (quoting *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988)).  FED. R. CIV. P. 56(e) also has certain, more specific requirements:

> [Rule 56(e)] requires that affidavits used for summary judgment purposes be made on the basis of personal knowledge, set forth admissible evidence, and show that the affiant is competent to testify.  Rule 56(e) further requires the party to attach sworn or certified copies to all documents referred to in the affidavit.  Furthermore, hearsay evidence cannot be considered on a motion for summary judgment.

*Wiley,* 20 F.3d at 225-26 (citations omitted).  However, evidence not meeting this standard may be considered by the district court unless the opposing party affirmatively raises the issue of the defect.

> If a party fails to object before the district court to the affidavits or evidentiary materials submitted by the other party in support of its position on summary judgment, any objections to the district court's consideration of such materials are deemed to have been waived, and [the Sixth Circuit] will review such objections only to avoid a gross miscarriage of justice.

*Id.* at 226 (citations omitted).

As a general matter, the district judge considering a motion for summary judgment is to examine "[o]nly disputes over facts that might affect the outcome of the suit under governing law." *Anderson*, 477 U.S. at 248.  The court will not consider non-material facts, nor will it weigh material evidence to determine the truth of the matter. *Id.* at 249.  The judge's sole function is to determine whether there is a genuine factual issue for trial; this does not exist unless "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*

In sum, proper summary judgment analysis entails "the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in

favor of either party." *Anderson*, 477 U.S. at 250.

## **Facts**[1]

The Lopardos originally filed claims against H&Q in 2002 alleging that they suffered economic losses because their broker, Frank Gruttadauria, engaged in a longstanding and elaborate scheme to defraud them and steal from their brokerage accounts. The alleged fraud took place over the course over more than fifteen years and Mr. Gruttadauria worked for several different brokerages during the course of the purported scheme. The scheme included a practice whereby Mr. Gruttadauria maintained two sets of account ledgers and would mail fake statements to his clients showing account balances and transactions that did not exist. The real statements would be sent to an accounting firm that was allegedly working with Mr. Gruttadauria in furtherance of the scheme, where they would be kept and maintained. The deceptive statements were allegedly generated in order to hide Mr. Gruttadauria's theft and other malfeasance from his clients.

The motion currently at issue is directed only at Hambrecht & Quist (and their successor in interest J.P. Morgan Chase and Co.), the brokerage Mr. Gruttadauria was working for when the alleged scheme was first implemented. The time frame at issue, therefore, is limited to the period of 1987 through May of 1989, the period of time that Mr. Gruttadauria worked for H & Q. . In May of 1989 the Lopardos transferred their H & Q accounts to Cowen and Company in order to keep their accounts with Mr. Gruttadauria when he switched firms.

---

[1] Unless otherwise stated, the facts as presented have been taken from the First Amended Complaint, from Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment, and from uncontroverted evidence submitted by the parties. Where there is disputed evidence, the facts have been viewed in the light most favorable to the Plaintiff, the non-moving party.

-5-

It is undisputed that the Lopardos transferred their accounts out of H&Q in May of 1989. It is undisputed that in prior to November of 1991, the Lopardos received a letter from their accountant, Mark Cottrell, alerting them to the fact that there were two separate and vastly different statements being generated for their accounts, one originating in New York and the other originating in Cleveland.  It is undisputed that the discrepancies in the Lopardo accounts at that time amounted to between $400,000 and $500,000.  The Lopardos outlined the discrepancies and pinpointed their concerns about the accuracy of their account statements in a letter (drafted by their accountant) to Mr. Gruttadauria at Cowen and Company in November of 1991.

The Lopardos allege in their Response to the Defendants' Motion for Summary Judgment that they subsequently had an oral conversation with Mr. Gruttadauria and he convinced them that their accountant was simply not sophisticated enough to understand the way the accounts were being handled.  Mr. Gruttadauria told the Lopardos that "he would correct any and all errors or misunderstandings," and that "all of [the Lopardos] assets were held under [his] control."  (Response at p. 9).  The Lopardos took Mr. Gruttadauria at his word and dropped the matter without any further investigation.  They also subsequently changed their accountant to one recommended by Mr. Gruttadauria.  The accounting firm chosen to replace Mr. Cottrell is implicated as a participant in the alleged illegal scheme against the Lopardos, but is not a named party in this action.

**Analysis**

The Court has recently reviewed and ruled on several Motions to Dismiss filed by the brokerage Defendants. The resulting Memorandum Opinion and Order was released just prior to this decision and dismissed Counts Three, Four and Eleven of the First Amended Complaint as against Defendants H&Q and J.P. Morgan Chase and Co. ("J.P. Morgan"). The remaining claims against H&Q and J.P. Morgan are Counts One, Two, Five, Nine, Ten and Twelve of the First Amended Complaint.[2] In that prior opinion, the Court held that the two year statute of limitations set forth in O.R.C. § 1707.43(B) would apply to each of these remaining claims. The limitations period began to run when the Plaintiffs "knew, or had reason to know, of the "facts by reason of which the actions of the Defendants were unlawful." Ohio Rev. Code §1707.43(B)(2002).

H&Q argues that the Lopardos knew or had reason to know of their injuries and of Mr. Gruttadauria's unlawful activities no later than November of 1991, and that consequently the statute of limitations on their claims has long expired. The Lopardos argue that because Mr. Gruttadauria lied in his explanation of the discrepancies in their account statements, they were not required to investigate further at that time. They claim that they did not actually discover any wrongdoing until Mr. Gruttadauria confessed to the federal authorities in January of 2002, and that the running of the statute of limitations should have been tolled until that time.

The "discovery rule" that tolls the running of a statute of limitations can be triggered

---

[2] The remaining counts state claims for breach of fiduciary duty, fraud, negligent misrepresentation, violations of O.R.C. § 1707.44, breach of implied contract/bailment, and negligent hiring, supervision and retention.

before a Plaintiff actually realizes that have a claim against a defendant. Every Ohio application of a discovery rule including the statutory language set forth in O.R.C. §1707.43(B) start the clock on the limitations period when the plaintiff knew or *should have known* of the defendant's wrongdoing. H&Q does not challenge the Lopardos' claim that they did not actually know of Mr. Gruttadauria's misdeeds prior to his confession in 2002. However, they argue that had the Lopardos conducted a reasonable investigation of the matter once they were alerted to the fact that there were multiple, vastly different statements being issued for each of their accounts, they would have timely discovered Mr. Gruttadauria's illegal scheme.

Ohio courts are nearly unanimous in their agreement that plaintiffs, once alerted to a problem, have a duty to "inquire into the matter with due diligence." *See, e.g., Au Rustproofing Center, Inc. v. Gulf Oil Corp.*, 755 F.2d 1231, 1237 (6th Cir. 1985)("Information sufficient to alert a reasonable person to the possibility of wrongdoing gives rise to a party's duty to inquire into the matter with due diligence."); *Snell v. Salem Ave., Assocs.*, 111 Ohio App. wrongdoing once the possibility of wrongdoing has been communicated); *Hirschl v. Evans*, 1996 Ohio App. LEXIS 1384, *8 (Ohio Ct. App., Mahoning Cty. 1996)(holding that an investor had "sufficient [information] to alert a reasonable person to the possibility of wrongdoing, giving rise to a duty on his part to inquire into the matter with due diligence" upon receipt of a letter).

Plaintiff was clearly put on notice of possible wrongdoing prior to November of 1991. The Lopardos were notified that three of their accounts with Frank Gruttadauria had two sets of statements being issued, one from the main office in New York and one from Cleveland. They were also aware that these two sets of statements showed vastly different balances for each account. Catherine Lopardo's IRA account showed a balance of $1,006.58 on the New York

-8-

statements, and a balance of $410, 393.20 on the Cleveland statements. A second account showed a balance of $15,047.50 on the New York main office statement, while the Cleveland statement controlled by Frank Gruttadauria indicated a balance of $53,187.28. That Cleveland statement also showed the purchase of a $75,000 bond that was entirely absent from the New York statement.

The Lopardos cite the U.S. Supreme Court case of *Field v. Mans*, 516 U.S. 59 (1995) for the proposition that accepting Mr. Gruttadauria's fraudulent explanation of the discrepancies in the account statements was sufficient to satisfy their duty to investigate. This case does not support their position. *Field* was a bankruptcy discharge case which dealt with an entirely different standard; it did not involve the tolling of a statute of limitations and it has no bearing on what constitutes due diligence in the investigation of a possible cause of action for wrongdoing for purposes of applying the discovery rule or otherwise tolling the commencement of limitations period.

The Lopardos also cite to Frank Gruttadauria's statement after his arrest when he told the court that "none of the victims were aware of his wrongdoing until January 11-14th, 2002." This statement also fails to support the Lopardos position that the running of the statute of limitations should have been tolled. Clearly, the Lopardos would not have maintained their accounts with Mr. Gruttadauria over the next eleven years if they had actually known or accepted that he had been stealing from them, lying to them and providing them with false statements since before 1991. However, as set forth above, the Lopardos actual knowledge is not the relevant issue. The determining question is whether in 1991 (or any other time prior to January of 2000) they had sufficient information to trigger a duty to investigate and uncover the wrongdoing they now

-9-

allege.[3]

The discrepancies between the New York main office statements and the Cleveland statements controlled by Frank Gruttadauria were serious enough to trigger any reasonable person to investigate potential wrongdoing.  The Lopardos did not exercise due diligence in investigating these discrepancies.  They talked to Frank Gruttadauria about the differences and accepted his word that he was in control of the situation and that the higher Cleveland balances were accurate.  There is absolutely no evidence or indication that they tried to contact the New York main office about the discrepancy; that they discussed Mr. Gruttadauria's explanation or promises with the accountant who alerted them to the problem; that they spoke to anyone else at Cowen and Co. about the issue; that they sought a second opinion from another accountant; that they reviewed statements for other accounts they held through Frank Gruttadauria; or that they contacted H&Q to see if the same problem had occurred while the accounts were held at that brokerage.  In fact, there is no indication that the Lopardos spoke to anyone other than Frank Gruttadauria about the issue, or that they questioned his brief and superficial explanation in any way.  A reasonable person would not have relied solely on the pat assurances of a broker that "all was well" in the face of an outside objective report that statements from the main office showed that their accounts held between $400,000 and $500,000 less than the statements issued by the

---

[3]

  The Lopardos also argue that the statute of limitations should be tolled under the theory of a continuing course of fraudulent conduct.  Although this argument may be worthy of some consideration as against Frank Gruttadauria himself, it is inapplicable to the claims against H&Q.  From 1989 forward, H&Q had no alleged association with Frank Gruttadauria, therefore, any fraudulent statements or activities that he engaged in after 1989 cannot be attributed to H&Q.  The course of conduct, if any existed, attributable to H&Q would have ended in 1989 and would have no power to toll the running of the statute of limitations after that date.

individual broker.

The Court, therefore, finds that the statute of limitations began to run on the Lopardos claims against H&Q no later than November 12, 1991.  The two year limitations period set forth in O.R.C. §1707.43(B) expired in November of 1993, more than eight years prior to the filing of this suit.  Consequently, Richard and Catherine Lopardo's claims against Hambrecht & Quist and J.P. Morgan are time barred.

## **CONCLUSION**

For the reasons set forth above, Defendants' Hambrecht & Quist and J.P. Morgan Chase and Company's Motion for Summary Judgment against Plaintiffs Richard and Catherine Lopardo is hereby GRANTED.  (ECF #280).   The Lopardos' claims against these defendants are dismissed with prejudice.  There are no remaining claims against Defendants Hambrecht & Quist and J.P. Morgan and they are hereby dismissed from the action.  IT IS SO ORDERED.

                                                              S/Donald C. Nugent
                                                              DONALD C. NUGENT
                                                              United States District Judge

DATED:   March 7, 2008